TEVA PHARMA NORGE v. TEVA PHARMA NORGE Our next case is number 2012-1498 PRONOVA v. TEVA. Mr. Downs? Good morning, Your Honor. May it please the Court? My name is Tony Downs. I represent Teva Pharmaceuticals. I'm going to talk about obviousness mostly, and I'm going to focus first on three quick points. First, PRONOVA's claimed invention is just concentrated fish oil. The ingredients of the claims are all naturally in the fish and in the oil. People have been concentrating fish oil for years. Think about castor oil to the pills that are available now over the counter. And they've been focusing on EPA and DHA, which were the only two known ingredients of the fish oil which had a beneficial medical effect. Here, PRONOVA just took natural fish oil, and using known processes that are described in the patent, concentrated further to make a high EPA-DHA concentrate. There was no secret sauce, no special ingredients. Second, the Joseph's Prior Art, which Teva focuses on, was part of the U.S. government's effort to promote concentrated fish oil through the National Marine Fisheries Service. And that prior art had all five of the claimed components, the five fatty acids, EPA, DHA, HPA, AA, and DHA. They're all there in concentration or ratios that are very close to or even meet the claimed compositions. Third, and this is what the KSR and 103 are to focus on, is the difference between the prior art, in this case Joseph's, and the claimed compositions. Here, that difference is extremely small and not patentable. In the Merck case, this court stated... I don't know if we need to take them right in order. I wanted to let you get all three of your points out. First of all, with respect to Joseph's, one of my problems with the record is it's unclear whether the trial court made a finding as to Joseph's. Are you arguing that the trial court made a finding of fact that Joseph's did disclose HPA, or are you simply saying it doesn't matter because the record's so clear? No, I'd say you're under two things. The judge did not make a finding either way about Joseph's. It really didn't address Joseph's, didn't say this is what it has or what it doesn't have. That's a bit of a problem. Well, not in the sense that there's no finding that we have to defer to or overcome. The record we submit is very clear because in Joseph's we had two things in that piece of prior art. The first was on one page, one page had the method spelled out by which the MFS made these steps. And our expert, Dr. Risby, who's a Cornell food scientist who's done work with fish oils, was very familiar with... I wish, I mean, you really could have asked the question a little more clearly. I mean, it appears that he was speculating. He said, well, I think this is what it would be, or I expect this is where it would show up. But he doesn't say that's clearly what it is. Well, what he did, he had two parts to his testimony. The first part was he said the method that they used would preserve all those fatty acids, including the HPA. And that's in the page before. That's on A20710 and A07570. And then he did say he had the actual drawing in his hand. I took the questions, to be fair. He had the drawing in his hand. He pointed out where the... and the way these chromatograms work is you have carbon weights. I bet you remember it coming in much better than it did. Well, and it was clear because he was there pointing to it in the transcripts as he was indicating. He pointed out the two different peaks for the carbon, the number of carbon fatty acids that bracket the HPA. And he said that the HPA is in there in between. Now, the chromatogram... But what he said is, I would expect, though it doesn't say it, that that's probably what this was. But, again, keep that in mind. He had already previously testified that the method would have preserved those ingredients there. And so... What was the prior page?  What was the prior page of the record? For that testimony, he said that the NFS method of content... Page. A-0-7-5-7-0. Zero. Which volume is that? I'm not sure. I think it's volume one. Go ahead. Oh, go ahead. No, I'm sorry. I must have typed it in correctly. I'll find it for you. Yeah, that page doesn't even... Yeah, I'm sorry. It may be A-5-7-0-1-4-0. We'll find it for you. Does your taste on obviousness turn on our conclusion that Joseph discloses HPA? No, it doesn't. Why do you feel in the art would have understood that? Well, first of all, no, it doesn't. Because what he said about Joseph's is also corroborated by the fact that in the Nielsen reference, there's another Joseph's composition that showed the presence of HPA in this same kind of NFMS-produced oil. And these were all made of Manhattan, which has HPA in it in certain times. Did he testify to that, or are we just supposed to conclude that based on the carbon listing? Well, in Nielsen, the carbon that are listed include the HPA. That isn't a dispute. It was a 21-carbon omega-3 fatty acid. But you don't have... I don't know. You didn't ask RISD that question? I don't remember off the top of my head, Your Honor. Well, I couldn't find it anywhere. All right. So the other point is that there was, at the time, no cross-examination of Dr. RISD by his testimony. They didn't ask him a single question about it. They now try to disparage him and say he wasn't an expert. They never objected to his testimony. They never objected to his qualifications. They didn't put on their own expert. There's no contrary testimony whatsoever to his testimony about this. And also, Dr. Ganim separately testified, he's another expert, that the methods of concentration that were used would preserve these acids, these other minor fatty acids, as you concentrated higher amounts of EPA and DHA. And again, that was not rebutted. So the evidence is there that it was present, or at a minimum, it was present in other concentrates. And the point is that 103 requires you to look at the differences between the prior arts and the claims. And in this case, the differences, and we focus on Joseph's, we think, to keep it simple, the differences are minor. And the evidence from Dr. Sachs, the Harvard professor from the medical school, was that there is no known biological effect, good, bad, indifferent, of these minor components of these ratios. Again, there was no rebuttal testimony of this. The cases that we rely on, Merck, titanium metals, and Aventis, say that if the difference between the prior art composition and the claim composition is minor, you have to prove that there was some unexpected benefit from that difference. And Dr. Sachs' testimony, which was unrebutted, says there is no difference. So if all those numbers, percentages, because they do claim minimum percentages of all these things, if all those things are meaningless, then I would think it would be easy for you to come up with your own composition that doesn't have those same percentages. You know, honestly, that's correct, Your Honor, but we're a generic drug company. And so the requirement is if we want to get the benefit of being able to file an abbreviated new drug application, we have to follow the composition that was approved by the FDA. And that's why we're in that situation, because we need to follow. Have you argued to the FDA that those portions of the composition are meaningless? I don't know the answer to that, Your Honor. But they did specifically come back and say to you, you need to show me that you've got all of these, even the omega-6s, in the same percentages. I'm assuming that we followed the claim language and followed what the FDA was requiring for us, and I'm not aware that we attempted to diverge from what was claimed. But the point is, from the composition, this isn't a structural case. We're trying to pick this bone screw from that reference or combine the two of them, or we're picking this part and combining the two. We're saying these compositions are so close. And Parr will focus on the fact that the other prior arc kind of brackets the claimed compositions up and down, and this is just fish oil, no known benefits to these minor components. This is kind of the classic composition case where it's obvious. Let's suppose that the prior arc didn't show these other three ingredients, the AA, HPA, and DPA. Would you still be arguing that those ingredients, because they have no benefit, are irrelevant to the obviousness inquiry? I would say that I don't think you can completely ignore the claims. I'm not advocating that you can completely ignore the claim language, but we're focusing on the fact that the prior arc did show these things and did show them in very, very close concentrations to what is claimed. I guess I'm trying to answer your question, Joseph. I don't think we have to go that far to say that those are completely irrelevant because it was in the prior arc. And the other thing is we put on a lot of evidence, which was really unrebutted, to show that, from both of our experts, that the standard methods of concentrating fish oils result in, when you try to increase EPA and DHA, the methods all kind of carry along this other carbon, other fatty acids that are close in molecular weight or close in shape. And we showed that the normal method, if you just concentrate EPA, DHA, you're going to preserve these other fatty acids. They're close enough in structure or in weight that they'll get carried along. And we said they are in the arc, even if the prior arc only reported 85% EPA, DHA, without really noticing, and then other fatty acids without breaking them down. So Joseph's is one where we actually have a chromatogram that says, here they are, unfortunately. They have a peak in the right place for the HPA, but it didn't get labeled. And Dr. Rizvi testified it was there, no rebuts. So I think what the court did was err in not considering these cases. What about the court's teaching away findings? I mean, the court said, did make specific findings about teaching away. And whether you agree with them or disagree with them, it's a clear error standard of review that we have to apply. I beg to disagree, because she really only looked at four references. There's one paragraph on that. And she says, four references, there are concerns of clinicians about one issue. And she cites four references. Two of them were not prior art, but put that aside. It's not really a finding, because she didn't consider the prior art as a whole. I think in the Allergan decision just last week, Your Honor, there was a focus on the fact that you have to look at the prior art as a whole. And Judge Robinson didn't do that. She more or less concluded that it was not obvious. And then she said, and by the way, there are these other things that mention these concerns. I don't think it's a finding. And if it's a finding, it's clearly erroneous. Because if you look at the whole scope of the art, the trend was towards increasing the concentrations. And there are documents, even ProNova's own documents, saying that these high concentrates are the drug of choice. There was a 1990 survey article by Harris, which is at A16488, which after a long survey of all these tests of the fish oil, said there are currently no hypotriglyceridemic drugs that have a better risk-benefit ratio than omega-3 fatty acids. And that's at A16504. But Harris was after the critical thing, right? But he was surveying only the article. The art that he was referring to was pre-critical. Right, and so I think it's fair evidence of what the prior art as a whole was saying and where it was trending. They were, you know, our own art shows there were multiple instances of these high concentrates. So the trend was not to what the judge was saying. Okay, I think we're almost out of questions. I think we're out of time here. I had reserved, I hope, a couple of minutes. Well, I think what we'll do is we'll let one of you have rebuttal time. All right, thank you. Thank you, Your Honors. I want to briefly address the obviousness issue, as Parr argued in its briefs. We focused on three references that had EPA DHA concentrations above 80% as required in the claims, Dahl, Abernardy, and Krisnewick. Those references did not quantify the remaining 12 to 15%. But Dr. Gannon testified that if you looked at what was in Manhattan oil, the predominant starting material, and you followed the existing methodology to concentrate that, that you would end up with those in those amounts. We also identified the Nielsen and Joseph references, which had amounts between 70% and 80% EPA DHA, which identified those different components in some percentages. Mr. Brown, at page 40 of the red brief, at the bottom, it says, Parr similarly distorts the trial record. Its claims charts, for example, falsely represent that Joseph disclosed 85%, when in fact it disclosed only 76.4%. I want you to address that. Certainly. We addressed that in our reply brief. This is a strong disagreement for that. I want you to address it because I'm going to ask your closing counsel about it as well. Certainly. So in our... We cited in our brief, as evidence for that, the claim chart that Dr. Gannon entered at trial. That chart, for that specific 85% value, cited Joseph and a particular page of Joseph where the reference says 85% omega-3. We also cited Dr. Gannon's testimony about the chart. Dr. Gannon's testimony said the 85% long-chain omega-3 limitation is met. Cited specific record support for it. They may disagree with it. We did not distort the record. Further, with respect to the five references, we think the analysis in Iron Grip applies here, where you look at the totality of the references that are focused on concentrated fish oil. With respect to those five references, if you look at the ranges that appear from those, they're almost identical to what's shown in the claim. We think that puts this case squarely within the titanium metals case and the Iron Grip case. If there's not some benefit to these additional minor components, and the claim chart that Pranova presents in their brief on page 38, I believe it is, it shows, if you look at our three principal references, Dalde, Renardi, and Krismulic, the only difference that they are asserting is the 1% of each of the minor components, that they now agree, and they've affirmatively relied on our expert, that they don't do anything. They've made this affirmative argument that you wouldn't have been motivated to optimize them because they don't do anything. But that's exactly what the numerical range cases are designed to prevent. You can't just put something in there that doesn't do anything and preclude a big sloth of the art from the public. But isn't their argument, though, that the prior art all was teaching that you should try to get rid of those things that don't do anything, and it was their invention to optimize those levels rather than get rid of them, and to allow them to be included within the formula? I think that is their argument. The issue is there is no optimum value for something that doesn't have a function, and the patent itself concedes that they're only there. Our interpretation of the patent is that it concedes they're only there as a byproduct of concentrating to reach concentrated EPA, DHA levels. And so we don't think there's anything in the patent that says these are optimum levels. They're just there as a byproduct of processing. The prior art reference they cite HAGSMA for removing other fatty acids specifically talks about removing them based on degree of unsaturation, meaning removing the saturated fatty acids that aren't an issue here. These are all very highly polyunsaturated fatty acids, AA, HPA, and DPA. And though there's nothing in HAGSMA that would say you want to take extra effort to get rid of more of those, you're trying to concentrate the EPA and DHA, and you're not really very concerned if you have a percent or two of these other similar acids in your final composition. With respect to the teaching away argument that the court raised, a quick response to that. The three references the court relied on we don't think would support a teaching away fact finding. The court didn't call it teaching away. There's a legal standard that the court laid out in the Allergan case. The prior art must be considered as a whole. And here, two of the references I wanted to point out, Mr. Downs' argument, two of the references that the court relied on were contemporaneous. They were post art. They were contemporaneous with the Harris publication. So if those are fair game, then Harris has to be considered fair game. And it's clear from that that that reference spends about 10 pages discussing LDL cholesterol fact and then says there are no serious side effects to omega-3. It's the best drug that we have. What do we do about the fact that the trial court never made any findings with respect to the objective indicia of non-obviousness? I think one strong response I think we have there is there is a very clear lack of nexus here. And I would point to the cross-examination of their expert. They didn't put on any of their scientific experts. They didn't put on. They only put on their commercial success expert. He had no opinions, pointedly had no opinions that any of the commercial success had anything to do with the specific percentages of the components that are in the product. And so that we would submit establishes a clear lack of nexus. You're still asking us to make findings of fact at this level. Or to conclude that on the overall record that there is an ultimate conclusion of obviousness that should be made because of the balance, because of the numerical range cases, which I think have an absolute requirement that you have to have a criticality of the numerical range. I don't think that's defeated by commercial success without some sort of showing of nexus at least. I'd like to spend a couple minutes or I'd like to spend my remaining time I think on the public use argument. And in particular, I want to point out there were three different public use arguments that were in the record at trial. One of them had to do with capsules. We're not asserting that on appeal. A lot of the district court fact findings had to do with that. The principal one we're relying on had to do with testing of public use. That's sort of hard. We submit not. We submit that the shipment of all of these samples for an overt commercial purpose. But he didn't have any corroboration for his testimony. Well, what we're focusing on is something different. It doesn't have anything to do with his testimony. It's undisputed that ProNova made several shipments. They shipped to General Mills. They shipped to Dr. Skrincic. And they shipped to University of Colorado. Several vials containing the invention. No dispute it was the invention. No dispute there was no confidentiality. And no dispute that it was not an experimental use. And so we would submit they were using the invention. Their director of business development said unequivocally, we did this so they would open their doors to us, talk to us, have credibility as a manufacturer. Those were overt commercial purposes. And under Invitrogen, they made the invention publicly available. General Mills, I've got these vials on the shelf. If ProNova doesn't file a patent application within a year, I can call my factory and have that made. They unfairly delayed their application vials. Are you saying that the trial court's credibility determinations only related to the capsule part that you're not pursuing on appeal? That is correct with respect to the third argument. And we're not pursuing that. We think her credibility determinations did not apply to the testing that Skrinska said he did because she doesn't reference them there. But the third argument has nothing to do with any of her credibility determinations whatsoever. There's no dispute that they shipped 23 samples to General Mills, two samples to Dr. Skrinska, and 500 milliliters to Dr. Davis at University of Colorado. There's no credibility issue. That's a pure question of law. And we would submit under the in vitro analysis that that is a public use. All right. Thank you, Mr. Brown. Are there questions? We'll give you three minutes of rebuttal time for one of the two. You can fight about which one doesn't. Mr. Monroe? If it pleases the court, I'd like to respond briefly to some of the comments raised this morning. I'd first like to note that the district court made detailed fact findings and credibility determinations, and the appellants have not established that any of those are clearly erroneous. About what? About many issues. Some that seem to be missing. There are some missing. And there are also some, just to, and I'll hit on topics that Tavit just raised. While you're responding to what Parr had to say, I'd like you to discuss page 40 of your brief, both at the top and the bottom. At the top you say, Dr. Risby, however, never testified that the peak associated with APA was located between the peaks for EPA and DHA. And you say that in support of your position that TEVA was overstating what it proved at trial. I don't like words like this. Yes, Your Honor. When I look at page 9572, it looks to me like they suggest otherwise. Your Honor, at page 9572, the testimony was, I will expect, although it does not say that this would be HPA, if you turn to the next page on 9573, his own counsel, Tavit's counsel, then said, and subject to not knowing exactly what that middle spike is, it does show the other two, which was not HPA. So their own counsel said, subject to not knowing what that spike is. What does their counsel's comment have to do with it? It characterizes that his testimony was amorphous. It was equivocal. They need to establish. We don't accept counsel's characterization. The question is what the witness said. The witness said he will expect it. He didn't actually state what spike there is. And for example, if you look. So based on that, and this is where I'm going, based on that, you say they're making a misrepresentation. And then you say at the bottom of the page that PAR falsely represents something. That's a different issue, Your Honor. I know it is. And that's why I asked counsel to discuss it, because I can take that very seriously. And we do too, Your Honor. The table at page 38 of PAR's brief, which says for Joseph, 85%, the row says at least 85% long-chain omega-3. And Joseph does not teach at least 85% long-chain fatty acids. That was the point that was misleading in the brief, to say that that actually, there was 85% long-chain fatty acids. That was the comment that we were responding to in their brief. That was inaccurate. Well, there's support for it in the record though, isn't there? Not for at least 85% long-chain fatty acids in Joseph. Well, I'm going to ask counsel to discuss that on their reply as well. And with respect to the minor components, we get back to the issue that, with respect to what they call the minor components, the patent treats as important components. And if you look at table one of the patent specification, the patentee actually summarized the key components, which are the ones that are then claimed. Table two, the patentee noticed there are a lot of other components that can be present, but the ones they focused on and the ranges they focused on were this unique set of components, which are in the Lovesa product and which they're copying. Let's assume that we reject your position. We find that Joseph's does disclose all of these ingredients. So if that's the case, why don't the range cases apply here? Well, it depends on which range cases we're talking about. If we're talking about the iron grip case, which they cite, which we would characterize more as a common sense with the weight plate has one end. Let's talk about titanium metals. There's a whole series of cases that says that, you know, if you disclose, if the prior art discloses the range, that a slight difference in that range doesn't render it non-obvious. So I'm asking you to assume that Joseph discloses all of these ingredients. So why is it obvious over Joseph? Because unlike titanium metals, where all the components were there and there was a slight difference between two of the components of 0.3, 0.31, here what we have is a list of components required by the claims in certain amounts and certain proportions. Appellants focus on the HPA component and the minors, whereas the main components are EPA and DHA. I don't think you're answering my question. Why don't the range cases apply? What's missing in Joseph's? Joseph has very low, 70% low DHA EPA content, which was one of the requirements of the claims, is at least 80% EPA and DHA. That's very different from what is disclosed in Joseph. That's the one difference? And then there are the differences, which are the smaller differences with respect to what they call the minor components. But the main difference is the concentration amount of EPA and DHA do not meet the claims, which we would say is a much bigger difference than what was at issue in these range cases. But you can see that the minor components are biologically inactive? Absolutely not, Your Honor. The testimony at trial, including by one of their own experts, is that HAGMA did teach that the other components can be biologically active. And when asked, Dr. Sacks was asked, isn't it true that HAGMA recognized in 1982 that fatty acids other than EPA and DHA could be biologically active? Response, yes. Did you cite any literature, prior art, or otherwise, establishing that the additional fatty acids required by the claims are biologically inactive? No. Yeah, but you conceded in your brief that there were no known biological effects, right? 45 and 46, you say, indeed, Dr. Sacks testified that fatty acids such as HPA and DHA had no known biological effects. We are conceding that the prior art said that it was inconsistent. HAGMA said there were potentially biological effects. The other art was silent. The patentee's invention was discovering that if you put all these components together that they got a very good composition. But how do you respond to your friend on the other side who said that the distinction between HAGMA and the components that you had was whether or not they were saturated fats? I don't think there's record support that that is the distinction that makes a difference with respect to the physiological activity of the components. It's a legal argument, but not an actual, in the record, something to support that. Why is it that you didn't put your own scientific expert on? And I know, just don't tell me it wasn't your burden of proof. I got that part. We did put on scientific experts for certain issues, such as Dr. Curtis and Dr. Keynes. We did present expert testimony. When it came to the issues of obviousness, we did not put on rebuttal experts based on what Your Honor was just noting. There was a failure of proof. As the district court noted in her decision, at the trial court level, the focus was on the references teaching 80% and above EPA DHA content. And then in their post-trial briefs, and she called them out in her decision, in their post-trial briefs they raised for the first time this real focus on Joseph and these lower than 80% references. And there was no trial testimony directed to that theory of their case. And even their so-close prior art theory has evolved since the time of trial. So there was no prima facie case set forth. They did not go through a typical obviousness analysis of identifying why in this art, where there's a lot of variability. They've admitted the art shows starting visual compositions vary immensely. The processing techniques you use can result in differences, elimination of components. That's in our patent specification. We even eliminate some components intentionally. And the art before the court was that components will be eliminated and you don't really know what you're going to get. Their own expert, Dr. Risby, kind of sums it up. He was faced with a lot of questions about the processing parameters and how they would impact what you would get. He finally, at the end of it, resorted to saying, well, we're scientists, know how to get what you want to get and know how to produce, get the product you want. That summed up their own case, which was a hindsight approach. If you know what you want, you can get there. They're relying on the range cases, and I want to come back to that. Joseph, if I understand correctly, you're saying the range cases don't apply because Joseph disclosed 74.4% of EPA and DHA, whereas the patent claims require 80%. Is that correct? That's correct. In combination with the fact the other components ranges aren't shown either. The claim as a whole requires these certain amounts of all these components together. The range cases like titanium metals dealt with where there was really only a slight difference between a couple of result-effective parameters. Wait, wait, wait, I don't understand that. I want to be very specific about what the problem is with the range cases. One of them is you say the claims require 80% by weight, and Joseph shows only 74.4%, correct? That's one. What's the other? Well, with respect to Joseph, there's a debate about whether Joseph discloses HPA. There's definitely no disclosure of the amount of HPA that would need to be present. There's no testimony about that. With respect to AA and EPA, the percentages of Joseph satisfy the claim limitations, right? That is correct, Your Honor. The two points you're making are the 80% versus 74.4% and the lack of a percentage with respect to HPA. Correct. The specific combination of components, having EPA, DHA, and a certain percentage combined with having the other three fatty acids, which are both omega-3 and omega-6 in specific ranges, that together, there's no suggestion that the claim as a whole would be off. Let's take the 74.4. Why is the 74.4 not close enough to the 80%? There is no evidence that a 74.4% composition, as in Joseph, what would happen if you up-concentrated that or you tried to achieve a higher percentage of those components in the concentration, what would happen to the other components in that concentration? The other components? Correct, such as HPA, DPA, and AA. I don't understand what you're saying. You're saying that the combination of EPA and DHA is close enough, but that it might have some effect on the other components? I'm not agreeing that it's close enough. Why isn't it close enough? There's a big difference between 74.4%. These ranges mean something, and in this art, when you look at the variability between starting materials and what happens during processing, these ranges vary a lot. Is there any testimony in the record that the difference between 74.4% and 80% is significant? There was no testimony on the record by either side as to what the difference would be between those two percentages. Okay. The testimony that Pernova relies upon, and what Pernova's focus is on the claim combination as a whole and how the claim components as a whole have the surprising effects that are outlined in the specification in which the district court acknowledged in her decision. As far as the no biological effect issue, I would like to mention again that the record indicates that there is potential biological effect with these components. What the appellants are trying to do is, they don't want to argue that those additional components have any impact, because they can't follow a typical obviousness analysis of why you would be led to modify the prior compositions to arrive at the specifically claimed composition, which is in Table 1 of the patent. Table 1 of the patent is the exact fingerprint chemical profile for what is ultimately in the claims that are being asserted in this case, and that's the exact profile they're mirroring. It does go back to the question we raised in our brief. If those don't matter, why don't you take them out? It's not true that you have to use everything that's the same as the brand product. You can go to the FDA and ask to have your product be different. They're choosing to use the very things in their product that they say are scientifically irrelevant, without trying to modify their product. So it's inconsistent with their obviousness. If they go to the FDA to ask that their product can be different, do they have to do their own clinical trials? It depends on the level of the change. I don't know what the FDA would say in that instance. You can file different sorts of amendments. You can do a separate 505B2 application, which still gives you a generic, but it does require additional testing. But that's what you do if you want to make a generic copy. The FDA does not sanction any infringement. Well, that's not the question. What they're saying is that under the statute, under the Hatch-Waxman Act, we're entitled to make a copy of this and sell it. And your response is, well, why don't you just take out these minor ingredients? That's correct. They say, no, that's not so easy because it's hard to get that done at the FDA. Well, we don't know because they haven't tried that. And I don't believe that's correct. I mean, designing around a patent can be difficult. Whether it's a FDA-approved product or a non-FDA-approved product, an automobile. But if you want to design around a patent... The whole purpose of the Hatch-Waxman Act is to be able to copy it and not to change it. I don't think I've ever seen a Hatch-Waxman Act case in which somebody has changed the formulation that's approved by the NDA. There are those cases, Your Honor, including often what the generic does is file a 505B2 application. Is that testing? That does require some testing. But again, that's their decision to try to mirror the... There's been no effort. There are changes that generics make in their ANDAs during the FDA process that their compositions are different than what is actually the commercial product. It doesn't have to be identical. It just has to be biologically equivalent, is that right? That is the only focus, is whether there's bioequivalence. So if these things are all meaningless, then they could be bioequivalent without having them in there? Absolutely. And they've made no effort to try to establish that. Can you turn to the public use? I understand there's a lot of findings that the trial court made. But I'd like you to focus on the shipments to GE. Why aren't those public uses? There's no evidence that there were any actual use of the product that was shipped. And in fact, that's not one of... If we're talking about the GE shipment, that's not one of the issues that they raised even on appeal. Their focus is on the Skrinska testing of two vials. Well, I think they've argued both. I mean, in fact, he argued one GE tint this morning. He did this morning in oral argument. But as far as briefing, they did not focus upon the GE shipment. And there's no evidence that the caps were actually used, that anything was actually used. The only evidence of record with respect to any of their assertions is the shipment, with respect to shipment, not actual use. At trial, there was sort of an understatement. At trial, the focus was on the capsules. And at trial, the focus was on whether or not there was corroboration for the alleged use of capsules by Dr. Skrinska. The court found there was no evidence of any actual use of the capsules. The court also found no evidence of the use of the analytical testing. And they can't point to anything in the record on appeal of any actual use of the two vials that were shipped to Dr. Skrinska or anything shipped to anybody else. That's why Parr backs up and gets away from the actual use requirement and tries to focus on this commercial exploitation argument that shipping it with a commercial purpose somehow constitutes a use under the statute. Whereas the Supreme Court's Egbert case, this court's precedent establishes, like the 3M case, simply sending samples isn't sufficient to constitute a use under the statute. The other cases they rely upon in their briefs fall into two categories. One category is where there's no dispute as to actual use. The dispute is whether it was public or not. The other category, there's no dispute as to actual use, the issue is experimental. Was that experimental? That wasn't the issue below here. The issue here was there was no evidence of actual use and shipment alone is insufficient to constitute a use of the product under the statute. Anything else? That's it, Your Honor. Thank you, Mr. Monroe. Just to clarify, Your Honor, if I could answer one question and then Mr. Brown will answer it. The question is the citation in the records that I raised for Dr. Rizvi testifying that the minor components would be there and I couldn't find it. It is at page A9750 is where he testifies that using that method the minor components would be preserved. Page A97... I'm sorry, 9570. 9570. Okay. Thank you. Okay. Mr. Brown, you have three minutes. I'd first like to just point out that the issue where the shipment being an independent public use, we raised that in our opening brief on page 23 and 24 and page 57 and 58. It was our principal public use argument, which was different from the one TEVA principally relied on. The second issue I would like to raise is to respond to Judge Wallach's question and I have the record sites here. As support for PAR's claim chart in our opening brief, we identified DTX 1573, which appears in the record at A16714-29. That cites a particular page of the Joseph reference. That page appears at A20710. That page states that the concentrate contains 85% omega-3 PUFA. Dr. Ganim testified at trial that at least 85% long-chain omega-3s is disclosed by that portion. That appears at A9433 line 19 to A9434 line 13. Mr. Monroe, did you have a question about that? Mr. Monroe, main argument as to why the range cases don't apply here is that Joseph discloses 74.4% of EPA and DHA by weight whereas the claims require 80%. What's your response to that? Dr. Sachs testified extensively at trial that first he identified multiple prior ART studies where using EPA-DHA concentrates effectively treated hypertriglyceridemia. Then he opined that a skilled artisan would have expected that the triglyceride lowering effect depended on the total EPA-DHA dose. As you increase the concentration of the capsule you'll get the same effect with a lower dose. It all depends on the EPA-DHA concentration. But the trial court made specific findings. You're wanting us to look at your expert  The trial court made specific findings to the contrary. She absolutely did not. She absolutely made no finding that increasing the concentration had anything to do with anything. There was no record support for that. But she did make specific findings. One of the factual grand factors is what the prior ART discloses. She did make the specific finding that the prior ART did not disclose the entire range. She did not make that fact finding either. She acknowledged our expert's testimony that there were 85 and 88% EPA-DHA concentrates out there. She acknowledged our expert's testimony that it could be readily produced following the prior ART. Her conclusion rested entirely on this particular articulated motivation language that we had to come up with a specific reason why you picked the different numbers for the different components instead of applying the numerical range cases as we described. Dr. Sachs' testimony about this that I think is important appears from A9231 to A9234 where he testified specifically that someone would have expected a higher EPA-DHA concentrate to have the same or similar effects on triglyceride as lower concentrates. It doesn't matter what the concentration is. It matters how much EPA-DHA you get. If you double the concentration, you can take half as many pills and get the same effect. I didn't find anywhere in the court's opinion that she disagreed with anything Dr. Sachs said or criticized his testimony or credibility in any way. When you get to the end of the discussion of obviousness, she cites the particular articulated motivation. She addresses one of our enablement arguments at the district court that you could have taken lower concentrated NMFS material and increased the concentration. She said that's where she made her statement about how it would have been contrary to LDL cholesterol concerns. None of those references had anything to do with any concentration of anything. They were all using off-the-shelf omega-3 acid supplements. They were using max EPA or super EPA that you can buy at the GNC store. Nothing in those references said the concentration of EPA or DHA or AA or any of these other ingredients had anything to do with anything. They're never even mentioned. We gave max EPA to people. We observed the LDL cholesterol went up. As we mentioned in our brief, that's not a teaching away in the context of the overall art. Thank you, Mr. Brown.